Good morning ladies and gentlemen. Our first case for this morning will be Pioneer Trail Wind Farm and American Wind Energy and others against the Federal Energy Regulatory Commission. Mr. Grabo. May it please the Court. Good morning, I'm Bruce Grabo representing the petitioners in this matter. Your Honors, this case is about rate certainty and rate predictability so that companies can have confidence to invest significant amounts of capital to develop new generations. Fortunately, there is a specific tariff process and there is a body of law that gives generation developers that confidence so they can rely on the tariff and those processes and allocate those capital. And that's what happened in this case. My clients developed wind farms, they entered the Midwest ISO or MISO queue, put up their study deposits, each 230,000 or so, and MISO undertook studies. The study process concluded as the tariff required and then they presented the results to us. The results showed that we needed six million in network upgrades. At that point, my clients looked at its business plans, its commercial pro formas, and decided that's a cost that they could bear to go ahead and develop these projects. I have a practical question about what happened next because there was a rather short period of time between the time that the six million dollar estimate for the system upgrades was thought to be the correct number and the time when the extra 30 megawatts from this one source turned out to be there and apparently that tipped things over so a much greater level of information was available. So it's a couple of months, right? Yes. So I'm interested to know, for example, could your clients have decided when this new obligation was at least possibly going to be put on them not to go forward with the wind farm? They weren't compelled by FERC to build this wind farm, were they? No, not compelled. They could have pulled the plug at that point. And they also, as I understand, were told that rather than putting the full 150 megawatts into the grid, they could have cut it back so as to not overload the system. They could have cut back by 30. Yes, Your Honor, those were options that were put to us, but based on the tariff and the body of law, we had a right under a contract and the Federal Power Act to move ahead and have the level of interconnection service that was studied for us. Can I follow up? Oh, of course. Please, go ahead. Well, my question is how certain you are that the contract model is the right way of thinking about this? Because looking at the regulations that govern this, I don't see any place that says that FERC cannot correct a mistake of fact if, as it seems, there simply was just a mistake of fact. Yes, FERC could do that, but I think in the big scope, you have to step back and say, what's going on here with the regulations and this entire process of developing generation? There's a specific tariff process that plays out, not just in MISO, but all over this land, and it's the same process, that there's a study that's done solely by the transmission provider, and the customers have no input into that whatsoever. We receive the study product and then are making decisions. No, I understand that, and that's why I asked the other two questions about what options were on the table for you. Certainly, you would like somebody else to bear this $11 million. We all three understand that perfectly well. But you weren't compelled to go forward. I don't know, correct me if I'm wrong, I didn't see anything in the record that says anything about what the total investment for these wind farms was. Not in the record. I do know that they were several hundred million each, a lot of capital invested. But at the time that we executed our interconnection agreement and knew the cost and decided to go forward, they had then executed land lease options. That's in the record. We had executed purchase agreements with third parties. Was that done in the six weeks? Please answer Judge Jarrett's question. Just to follow up on what Judge Wood said, and you anticipated, at least in part, the preface to my question. Your clients began changing position based on the original estimate of what, $6 million or whatever it was, and started making arrangements with their customers and the like, as I understand it. That's correct. And it's your position, at that point you didn't know that you were going to be asked to pay for the additional cost. Didn't you have, wouldn't you have some obligation when the, when MISO said to you this is going to cost $10 million more to say who's going to pay for this and if it's us we're going to back out? No, Your Honor, because the precedent at that time, the tariff was very clear that our cost was locked in, so to speak, once the generation interconnection... Do you think you had an obligation to tell MISO that? Did we have an obligation? Yes, and we did. Immediately. Twelve days later, once we were notified... No, no, before you were notified that you were going to be expected to bear the cost and before you went to all the trouble of changing position based on the $6 million estimate, do you think you had an obligation when you were alerted that there was going to be a restudy and it was going to cost more money to say we're not going to pay for that? Yes, and we did. Twelve days later, we responded... Twelve days later from what? After MISO, once we had an agreement and then three months down the line, when we're already developing our project, when MISO approaches us to say they did a mistake, they didn't do their studies correctly, we responded twelve days later and said, well, we understand you have a problem, but that's not our cost. I see, so you had changed position in reliance on the original $6 million prior to being notified of the change. Absolutely. We expended capital, we were developing projects, and that's in the record. I understand. Mr. Crabo, do you and your clients agree that these upgrades were necessary given the size of the projects you were wanting to construct? They are needed. They are needed for the system. There was no disagreement with that on the record, but that doesn't... And you agree that with FERC, that in essence, the charges here are the charges that would have been imposed upon you if no mistake had been made in the first place? No, Your Honor, I don't agree with that. Why not? For two reasons. First of all, you have to step back and understand what these facilities are. These are network upgrades that get integrated into the larger MISO grid, so everybody benefits. It's not just our client. The whole grid benefits, and FERC has a policy that doesn't necessarily require the generator to put up the money and pay for those. Maybe you didn't understand my question. If the original study for your projects had not made the 30 megawatt mistake, would the charges for network upgrades have been $17 million total? Based on this, yes, we would have been informed of that, but that's the whole problem of the process. I think all of us understand the nature of the problem, and we understand the reliance arguments that you're making. At the same time, we're also dealing with a human system, and the loss has to go somewhere, and it's FERC's job in the first instance to decide where. The question, I guess, that I kept looking for in all of your arguments about our reliance upon this was some indication that $11 million was the difference between build and not building, between building the project and not building it, the difference between profitability and loss. That was not put in the record here, Your Honor. I assume for good reason. Yes, and the reason is because there was a strict body of law and precedent where FERC has said once the studies are done, the interconnection customer can rely on those. But you're assuming that you, I mean, surely as a good lawyer, you tell your client, you know, if we win, this is what's going to happen, the loss will fall on Ameren, for example, possibly. If we lose, then we're going to have to ante up the other $11 million, and I guess what Judge Hamilton is getting at is in the event, even if you thought it was a 20% chance or whatever you think the chances may be, the record doesn't reflect that this was a deal breaker because you didn't back out. You know, you're here, you're making your arguments, we're listening, but... I understand that, Your Honor, and from our position, showing that it was a deal breaker is not the standard that should apply here. The rule of law, the ability to rely on that tariff... Well, and that's why I'm getting... And FERC's precedent to date... The system needs some way of handling mistakes of fact, and there was certainly a mistake of fact. You're proposing one possible way, which is to use the model of contract for that first, the $6 million price tag for the system upgrades. FERC, as we all know, essentially follows a policy that the energy producer is the one who pays for the costs of putting the new capacity into the grid. So that's why I think Judge Hamilton's question was an interesting one. If you had known up front that it was going to be a $17 million price tag, we don't have any reason to believe that you wouldn't have gone ahead with the project. You have to upgrade the grid to take the new capacity. That's pretty straightforward. So FERC has said there's a little play in the joints. And indeed, getting to Judge Dara's questions, it's hard to see how much happened between the date of the first communication from FERC, what you're calling the contract, and six weeks later. How much did you do to change your position over that period of time? That is not in the record here. I agree with that. We have put in the record that there is economic harm. And some of it is just, from our point of view, common sense. You cannot allocate so much capital. And the fact is, I mean, this is the first time this has come up because there's been such a solid system since 2003. And this system plays out all over the nation. And we have to rely. So FERC says, maybe you can comment on this. FERC says in their brief, and actually if you look at the Commission's decisions, they say that this catching of this type of error is a very rare event. They say they don't expect that they're going to have this problem very often. But when it happens, they have the flexibility, which they've pointed to in a number of ways, to address it. Now, you're suggesting it's rare for a different reason, that people in the position of MISO or its contracting partner, Ameren, have been the ones who have borne the risk of loss. And I don't know if there's any evidence of that. That MISO has borne the risk of loss? Or maybe we've had an error-free environment until your case? We have not run into this situation because there's such a responsibility on the transmission provider. They have all the data. They're the only ones who can prevent this from happening. The customers are completely at their disposal to get it right. But you're not aware of any case like this where an error has been caught and somebody said, well, there's a loss. Well, not that it's been reported. It may have happened. It may have happened. I don't know how it's been dealt with. They can be dealt with different ways. The transmission provider can decide, we messed up here. We'll bear the cost. Or the utility might. We don't know. You make the comment that you thought the commission erred by not giving you the discovery regarding fault in the preparation of the first study. Say that again. I said you make the point in your papers that you believe the commission erred by not giving you some discovery regarding the fault that may have occurred in preparation. Well, that's right. The preparation of the first study. What difference would that have made, given the commission's ruling? In this instance, you have a situation where an error occurred in that base model. And we never see that. MISO sees it. AMRIN sees it. And AMRIN, for some reason, put evidence in the case saying that it told MISO it had a problem with the model. Well, someone, MISO or AMRIN, knew there was a problem. We never knew. My question is not to interrupt you. My question is, assuming all that's true, what difference would that have made, given the tone of the commission's opinion? Because if the commission would have allowed discovery, we could have found out who made the mistake and perhaps the commission could go the other route, which the tariff and its rules already provide, which is that AMRIN can roll the cost in its rate base. And FERC has said under decisions that it expected utilities. You think their state regulatory folks would let them roll this kind of a mistake into their rate base? Well, FERC has said that if you roll this into your rate base, it expects the cost to be lowered. Everybody would benefit. And if I were on the Illinois Regulatory Commission, why would I say that the rate payers for AMRIN have to bear this cost rather than their shareholders or MISO? Well, two reasons. One, if FERC says they need to, it has to be passed through in rates. But secondly, it's because all of AMRIN's customers, the Illinois customers, benefit from that upgrade. But not from the mistake. They benefit from the upgrade. When there's a mistake, is it the shareholders who bear that financial consequence, here $11 million, or is it the rate payers? And lots of state Illinois Commerce Commission, other state regulatory commissions, have frequently said it's the shareholders. And that is another avenue. In evidence, there was a contract between MISO and AMRIN. And we said, look at the contract then. AMRIN's putting in evidence that it told MISO that something was wrong. And now, through no fault of our own, we're bearing the brunt. But what reason is there to believe that it's this $30 million mistake? It looked like a very vague statement to me from your briefs. What, that it was a? That it was this precise mistake that AMRIN was talking about. Well, it's exactly that mistake. Well, we don't know that. We don't know that. That's the whole problem. It's not clear at all. Well, that's exactly right. And that's why we were saying to FERC, how can you, the heart of this matter here, is a utility not performing the studies the way they're supposed to and required to. Right. But the heart of the matter is that your clients want to hook up to the grid. That's right. Mr. Grabo, if I could, I'd like to pursue a topic we haven't talked about yet, in addition to the option one, option two thing. But with respect to the, your papers are quite critical of FERC for, in essence, not providing a very specific rationale for their decision to hold your clients accountable for these additional costs. And the amicus who's on your side in this case makes a big deal out of that. I want to just at least get your comment on the possibility that the very vagueness of the FERC decision in this case might actually be a virtue, because it does not provide much comfort to other independent system operators or their study contractors to think that all will be forgiven if they make similar mistakes in the future. The vagueness here makes clear that they were lucky to be bailed out by FERC on this problem, and nobody can count on that in the future. Well, I would agree. They were lucky to be bailed out. And from our perspective, I think this is a very damaging precedent, because now any transmission provider across the nation really can look to this decision and say we will not have accountability if we make a mistake. That's the opposite of what Judge Hamilton just said. He's saying they can't look at this decision because FERC really tried to put down this decision. All you know is that you might get lucky. From our perspective, that's not the case. This is a decision that can be a very damaging precedent. Okay, thank you. And it's the first time. I know I'm into my rebuttal time. Could you also briefly tell us about just what is at stake on this Option 1 versus Option 2 issue? Option 1 and Option 2 is a lot more money at stake. In Option 1, Ameren can give us all our $6 million back, but then recover it again under a full-blown rate schedule with rate of return. So we pay much more than we had to. Can you quantify the difference for me, counsel? Money-wise, it's another – well, actually we don't know with precision because there's no defined rate. You're fighting about it. Could you please give us an idea? It's at least another doubling, another $6 million. $6 million becomes $12 million. There's evidence in the record in other cases where Option 1 has been tried and the customers had to pay 360% more than the original amount. That's why we've argued it shouldn't be applied in this case because it was no longer part of the filed rate. I see I'm into my rebuttal time, so I'd like to end at this time. That would be fine. Ms. Rylander? Good morning. May it please the Court, Elizabeth Rylander for the Federal Energy Regulatory Commission. So, Ms. Rylander, let me start out with something that troubles me about the Commission's decisions here. The Commission announces, you know, ex cathedra, that this is a rare case. But I don't know what to make of that. It's very conclusory, and Mr. Grabo argues strongly that, you know, we often have a rule where he who makes the mistake is the one who bears the brunt of that mistake, and nobody thinks that the wind farms were the ones who made this mistake. They're the ones who would like to connect to the grid, to be sure, but they didn't think that 130 megawatts was really just 100 megawatts. Yes, Your Honor, that's correct. The Commission did find in its orders, though, that it could not hold the wind farms blameless for this error. Based on what evidence? I don't believe it cited anything, Your Honor, but upon examination of the record, the Commission did not make a determination as to who was at fault. So is there any conceivable basis for blaming the wind farms? There must be, Your Honor, because the Commission's finding was that it couldn't find them blameless. Well, wait a second. No, the Commission is supposed to, administrative agencies in general, which includes the Federal Energy Regulatory Commission, are not supposed to just make pronouncements with no explanation. Part of the deal with the administrative process is that the agency has to cite to evidence in the record. That's why it winds up with the benefit of things like an arbitrary and capricious standard of review or a substantial evidence standard of review, and when the Commission just says it's rare, I don't know whether that means it's never happened. I don't know whether it means it happens once a year or what, and when the Commission says no one's blameless, why? Is there a memo? Is there some responsibility to give data or to monitor things? There has to be a reason. Just saying so isn't a reason. Your Honor, I am not able to say what prompted the Commission's thinking there, so we should just disregard that statement. It's really not helpful. Let me pick up on that. Matter of fact, when you talk about the record, not only is there an absence of any evidence in the record as to any blame, any misconduct by wind farms, but the record clearly shows that they had no part in the preparation of the study, none whatsoever. They were sent the study data at different points during the process, Your Honor. The critical mistake, though, had to do with somebody else's generating capacity, right? The critical mistake did have to do with somebody else's generating capacity, yes. So how could these wind farms have been expected to spot that kind of a mistake? Your Honor, I don't feel comfortable pining on that because it's too far outside my expertise, but what I do feel comfortable saying is that the Commission determined that what is at issue here is not fault or blame but the filed rate, which is the contracts at issue here. The contracts at issue here did specifically say that the wind farms agreed to pay for network upgrades that were necessary to effectuate their interconnection. And as Judge Wood has pointed out a couple of times, what they want and what they continued to want following two opportunities to reduce their output in order to reduce the amount of additional upgrade costs, what they continued to want was to connect to the grid at the same level of output originally contracted for. Could we back up for a second to this question about whether this is a rare problem or not? Yes, Your Honor. And I guess first I'd like to ask you to tell us if there's any factual basis for that or is it just relying on the absence of anything similar? Second, I wonder if you could comment on the point in your brief that FERC had said that amendment of interconnection agreements to accommodate additional upgrades is a, quote, not infrequent occurrence, which seemed to me to be at least in some tension with the Commission's statement that this is rare. What is rare, Your Honor, are errors of this type. The Commission didn't identify any orders, nor has Petitioner pointed out to this Court, nor have I been able to find another case involving a study error of this kind. So are you making the assumption that if there had been a study error of this kind, we would have been, first the Commission and then a court someplace, would have seen much the same argument about who bears the loss or who bears the expense of that mistake? In light of the way the contracts were drafted, Your Honor, yes, I think so. The contracts state very clearly that the interconnection customer is responsible for the cost of network upgrades that are necessary to effectuate their interconnection. Part of the process is that MISO, as the system operator, determines exactly what network upgrades are necessary and which network upgrades are attributable just to the interconnection. Right, and nobody seems to be arguing about any of that here. No, Your Honor. Everybody understands network upgrades are necessary. Everybody understands that if it's really 130 megawatts, it's at the $17 million or so level. Suppose, though, this record showed that after the wind farms were told it's going to be $6 million, they went out and bought up a lot of land or spent a lot of money. Now we know what this item in the budget is, and they did that. Wouldn't that be a very attractive case for saying that Ameren should bear that extra expense? Your Honor, the only question that FERC faces here is whether the agreements presented to it for review are just and reasonable. So you're saying essentially the first rate or the first contract, if you want to use that term, the first piece of paper that FERC sends to the wind farms isn't really worth the paper it's printed on. It's saying it's going to be $6 million, but whenever FERC has an inclination to do so, it can change that amount of money. No, Your Honor.  No, Your Honor. That is certainly not my position. The original agreement does give a good faith estimate, but a non-binding estimate of the amount. Where does it say it's non-binding? I think that would be very important. If you could show me a regulation or language. I believe that is in the language of the agreements itself, but with apologies, I do not have a citation with me. I'll be glad to follow up with a letter to this Court if that would be helpful. Well, there are specific contingencies identified, right? Yes, Your Honor. Okay, in Section 11.3.1. Correct, Your Honor. And those are contingencies that give the independent system operator the right to adjust, correct? Yes, Your Honor. 11.3.1, which all the parties agree is not applicable in this case, refers to a change in system configuration that occurs prior to interconnection. So, for example, that might be an earlier queued generator dropping out of the queue. Right. But, I mean, the argument that the petitioners make here is certainly understandable, given all these specific contingencies that have been laid out. Why shouldn't we infer that the particular kind of error here, this contingency, this uncertainty, was excluded deliberately? Because, Your Honor, this type of error is not related to a change in system configuration. As you said earlier during the petitioner's argument, this is a human system that is dependent on the inputs of many people and incorporates many variables. This isn't related to a large change affecting the system, but merely to an input error in the data. But where is the regulation that says that this is a contingent number, that we do the very best we can to eliminate error in the inputs, but should the commission find that there's been an input error, then it's going to go back and recalculate what the power company is going to have to pay. I don't remember anything like that from your brief. I thought you were relying completely on Section 30.11. That's what I thought, too. Section 30.11 is very important to be sure, Your Honor. So is there something else that you left out of the brief? In terms of regulations, I would refer the Court to 18 CFR 40.2, which requires that each applicable user, owner, or operator of the bulk power system comply with commission-approved reliability standards. In this case, because of the error, the agreement had to be amended such that the parties could perform their obligations in accordance with reliability standards, which is required both. Could the commission have revoked the permission that the February 5, 2010 agreements, once they're calling the original agreements, and said, you know, we've discovered that the mafia runs these wind farms or something, so we are now revoking their permission to connect to the grid? The issue, again, Your Honor, is whether – I'm trying to explore how much is this a contract, and how much is this really more in the nature of a regulatory license, which is always understood to be subject to modification by the agency? Yes, Your Honor. If you're using the language of contract, Mr. Grabo is using the language of contract, and maybe that's correct, but your argument isn't quite on the contract wavelength. Then let me try it this way, Your Honor. The pro forma tariff itself and the pro forma large generator interconnection agreement was developed in specific response to – was developed through a commissioned rulemaking process under the Administrative Procedures Act. The pro forma agreement and the pro forma generator interconnection procedures were laid out in the commission's order number 2003, and they were incorporated into regional transmission organization and other tariffs one by one. So while we are referring to the agreements here as a contract, the pro forma is lifted out of the tariff and is in fact something that the parties have limited ability to negotiate between themselves. Much of what is contained in them is regulatory language that was prescribed by the commission. Is the cost of connection one of those things the parties can negotiate? The number of network upgrades necessary to connect the wind farms is something that MISO, which is the independent entity, is obligated to identify. Would you say basic principles of contract law apply to that agreement? Yes and no, Your Honor. To be exact, there are cases that explain that there may be different forms of network upgrades, different levels of network upgrades that the regional transmission organization, meaning MISO, can choose to build. What MISO can't do is to force the wind farms to pay more than they are required to pay to effectuate their interconnection. So I would say the exact type of upgrades, the exact equipment, maybe there's wiggle room in that. I guess what we're all sort of hammering at is the generation interconnection agreement. When is an agreement an agreement? When is MISO committed to deliver the upgraded system to the wind farms people at $6 million? I mean, applying basic principles of contract law, wouldn't it seem they're locked into that? Your Honor, what came into play here was impossibility. At the point of the $6 million, it was not possible for the- It's not impossibility. It's just a question of who pays for the error. Everybody agrees the upgrades had to be made. Yes, Your Honor. I think possibly Your Honors are asking two different questions. The way the original agreements were drafted with interconnection at 150 megawatts per wind farm and the $6 million that was specified, all three parties could not perform their obligations under those terms and conditions without violating the agreements one way or another. The issue would be not whether the agreements were violated, but how. Well, it's clear that MISO made a mistake in telling wind farms that they could connect for $6 million. Yes, Your Honor. I think everybody understands that. Yes, Your Honor. The question is, the basic contract principles then apply. Could wind farms then, through an election or remedies process, sue MISO for the activities they undertook, the change of position they undertook in reliance on that $6 million figure? At least vis-a-vis the commission- Could they sue for specific performance for $6 million? At least vis-a-vis the commission, Your Honor. That would violate the filed rate doctrine and that would violate reliability standards. If performance at this level of interconnection was continued for $6 million, there would be not enough network upgrades to preserve reliability. Well, we're back to what Judge Hamilton talked about, not enough system. You're talking about there's not enough money to upgrade the system to provide that. Yes, Your Honor. Your point is something has to give. There either has to be more money spent and it has to be spent by someone, which is what we are largely here for, putting the option one, option two stuff to one side, or less power would go into the grid. Something would have to give in order to have the whole thing in compliance. Many of these things can give. You could put less power in, you could spend more money, you could do things, so it's not impossible in any literal sense of the term. But something has to give. That is correct, Your Honor, and that is why Articles 11.3 and 30.11 of the agreements allow for flexibility and allow for changes in order to ensure that the final result is reliable and that the filed rate is enforced correctly. Ms. Rylander? Who's going to pay for that is the question? I'm sorry, Your Honor? The question is who's going to pay for those changes? The wind farms have agreed to pay for the cost of the network upgrades, Your Honor. Well, they agreed to pay $6 million. A lot of this argument is just getting very circular, like the idea that if FERC said it, there must be evidence in the record for it. Let me ask you, though, what does FERC do if, for example, the mistake here is not an $11 million mistake but a $90 million mistake that makes the difference between the project being profitable and not profitable? Then, as Your Honors were pointing out, the wind farms would have the option to walk away. Well, they may not know, and when, and can they get their money back that they've already spent in reliance upon the study? Look, the case is not a terribly sympathetic one for these petitioners because of the relatively modest amounts of money in terms of the overall capital. It doesn't look like a build-no-build decision, but it's pretty easy to imagine other sorts of mistakes where FERC would be asked to bail out independent system operators and their contractors that are a lot larger. And I don't see any clear signal from FERC as to how they would handle that. No, FERC did not give any signal of that in these orders. FERC stuck to the facts. And could I ask you to go back to something I asked you earlier, which is about the statement in your brief that amendment of interconnection agreements to accommodate additional upgrades is a not infrequent occurrence? Yes, Your Honor. It is, in fact, a not infrequent occurrence, and there are at least two other cases cited in the brief. One is MISO 122 FERC, paragraph 61019, dated 2008, in which additional interconnection facilities were required to accommodate a generator that decided it wanted to connect at a larger level of output. Okay, that's a generator-initiated decision, right? Yes, that is a generator-initiated decision, but then the interconnection agreement had to be amended to account for larger upgrades. That's not a mistake. That's just a change in plans. That's not a mistake. There are no other cases concerning mistake that I've been able to find. And could I finally ask you to explain to us why the Commission is so interested in protecting expectations on the Option 1 versus Option 2 issue but seems less concerned about protecting expectations and reliance interests on the network upgrade issue? Yes, Your Honor. Starting with the network upgrade issue, as Judge Wood pointed out earlier, something had to give, and it was not a question of whether it was possible to preserve the expectations perfectly. But the Commission found that the parties did the best they could under the circumstances here. With regard specifically to Option 1 and Option 2, the Commission's general policy is to enforce contract expectations where that's possible. And here in the eon re-hearing at paragraph 34, the Commission found that Option 1 balances the interests of the parties,  So that's Option 1. That's looking at these two different tariffs. The February 5 is kind of one self-contained thing, and then the later one for the extra $11 million is the second one, because actually Option 1 is only going to apply to the original work that was expected, right? Yes, Your Honor. Okay. But I had exactly the same question Judge Hamilton had about why the Commission was being so solicitous of expectations when it seemed to me that I was reading almost a schizophrenic brief, you know, that nobody was worrying about expectations when somebody's told it's going to cost you $6 million. Oh, no, we really meant $17. You know, and then on Option 1, Option 2, when it's quite clear that the wind farms don't like Option 1 at all, you know, that it works out somehow to cost them considerably more money. So it's a strange position to be in, at least as a matter of approach. I'm sorry that it seems self-contradictory, Your Honor, but in this case, once again, with regard to Option 1, it was not necessary to make a change in order to preserve the expectations of the contracting parties with regard to the original upgrades that were originally bargained for. But with regard to the error and the number of network upgrades, something had to change in order for the agreement to be properly enforced. Okay, so you could preserve it with the Option 1, Option 2, and I think I understand your answer, at least, to be that the Commission felt that it couldn't. I'm not quite sure I understand. Isn't there just an inherent inconsistency when the Commission takes the position that the original $6 million offer can be unilaterally changed and a new agreement can be effected, and then to say that the agreement that was effected prior to April, that the agreement effected prior to the March 20th date, regarding the Option 1, is still in effect? I mean, isn't that just inherently inconsistent? No, Your Honor. Once again, the Commission did the best it could, and I think AMRIN and MISO did the best they could to preserve the initial expectations as to the extent possible when making the changes. They have a new agreement. Yes, Your Honor, it is a new agreement, but that doesn't extinguish the fact that... Can I ask about the new agreement, though? I mean, if the old agreement says, do Projects 1, 2, 3, and 4 to interconnect, and the later agreement says, and now also do Projects 5, 6, 7, 8, and 9 to interconnect, I can see how those could live together, and you could allocate the $6 million to one and the $11 million to the other, and everybody would understand. I don't know if it's that clear, but if it is that clear, then maybe there just is Agreement Number 1 and then on top of it Agreement Number 2. Yes. Yes, Your Honor, that's correct. And Agreement Number 2 was an amended generator interconnection. So it wasn't supposed to just completely... Well, your opponent argues it was supposed to completely supersede 1. Yes, Your Honor, he does, and that is to his client's financial advantage, but the parties did have an agreement prior to March 22, 2011, which is the date in which the tariff changes took place. Right. All right, well, I think we're going to have to move on. I believe we've used up your co-counsel's time, but I'll give you a couple of minutes since this is complex enough to warrant it. Thank you, Your Honor. And certainly if Mr. Grabo needs some extra time, we will balance it. I'll probably answer some of your questions, Your Honor. My name is Kirk Jacobs. May it please the Court. I'm counsel for Ameren, Illinois. First, I'd just like to answer your question about is it a contract, is it a rate. Obviously, it's both. It's a contract. It is filed as a rate, and it contains a clause that says either party may unilaterally apply to the FERC to change any term, any rate, anything in this contract under Section 5 of the Federal Power Act, and FERC will determine whether the change that that party wants to make is just and reasonable. So it's not like a private contract where it can't be changed and the parties are locked in. It is like a rate because it's filed with FERC and it states in that. What's the utility, then, of the $6 million commitment in the first agreement? Excuse me? What's the utility, then, to these wind farms? Well, the utility is that in every case... To the $6 million commitment in the first... This interconnection system has been in process, in place since 2003, and as Petitioner's Counsel said, this is the first time there's been a natural error in the inputs to arrive at an error on what's the base case. So, obviously, there's been utility to many, many interconnecting parties in figuring out what the cost of these network upgrades are going to be. And that's exactly what the wind farms assumed in this case, is it not? Well, they say that. They put in no evidence of detrimental reliance, and that's FERC's key point. FERC said to them, show me what you would have done differently. Had you known it was, you know, $11 million more, $16 million more, tell me what you would have done differently. They've shown no detrimental reliance. The cost, the relief they want here to be relieved of $11 million of upgrades, those are costs they would have had to bear had no error been made. And FERC is just putting all the parties back into the position they would be in had no error been made. And they can't get around that. Their only response in their reply brief to that is, well, we lost an opportunity to make this decision. If we had been told back when we signed in this in February of 2010, we would have had the opportunity to decide whether we wanted to abandon this project or not. Just to nail this down then, you're saying that if we scour this record, we will not find any evidence of a change in the wind farms' position between February 5, 2010, and April 29, 2010. Correct. By April 29, they know that that $6 million figure is a bad number. Or at least that somebody thinks it's a bad number. So they're on notice. Yes. It's Exhibit 15 to their protest where the email that was sent to them by AMRIN is reproduced. It's Exhibit 15 to their protest. And AMRIN tells them, they don't just tell them it's an error, they tell them it's $11.6 million more of network upgrades. You can either enter into an amended GIA that includes that figure, or you can reduce the output and avoid these costs. So it's clear that from AMRIN's perspective, they're going to bear the costs, and they either enter into a new amended GIA and pay them, or they reduce the amount of their output. And they knew that on April 29. And FERC is quite clear in its order. It says, you didn't show us any way in which you changed your position between February and April. And they say, well, we did some other things after that too. But again, they put in no fact. They were allowed to aver facts. They were allowed to put in affidavits saying we would have done X, Y, and Z if we had known. They put in no concrete fact saying what they would have done differently. And so this is a case where FERC has before it no detrimental reliance whatsoever. So perhaps to answer Judge Hamilton's hypothetical, if they had put in something, then maybe FERC would have a different obligation. Precisely. And as Judge Hamilton pointed out, FERC protected itself saying we're deciding this on the totality of the circumstances before us. And one of those primary circumstances is that there's been no detrimental reliance. Do you think one of the relevant circumstances is whether the petitioners were blameless? FERC said it wasn't relevant. So I tend to think that it's not relevant here, number one. Are you aware of any evidence that they might have had some responsibility for it? They were part of the ad hoc study group to which all of these studies were circulated. They've claimed in lawyers' words that they don't have any ability to analyze. Well, how much underlying data does that ad hoc study group see? They see... It's one thing to see a draft of a report. It's another thing to get down in the weeds and look at the data. It's a good question, and I don't know. I know that the actual input data was circulated to a number of transmission owners. Ameren is one transmission owner. NIPSCO, Northern Indiana Public Service Company, is another. And the error was actually made on NIPSCO's system. That's where the Benton Wind Farm that was miscalculated as 100 megawatts is really located. So it wasn't even on Ameren's system. All of these transmission owners give in to MISO what the modeling of their own transmission is, and MISO produces the model. So it is a collaborative process. So again, it's an error for petitioners to say, well, it's all MISO's fault or it's all Ameren's because there are four or five transmission owners involved and the outputs of this study are circulated to petitioners as well as to all the others. Now, even if they could put in an affidavit, which they haven't, saying we didn't see these inputs, we lacked the ability to know, we have no ability to double-check, that's not a fact that they put in the record. But even if that were true and they are, quote, blameless, FERC said, we're not here to determine, well, this party has blame and this party is blameless. We're here to determine what the just and reasonable rate is under Section 5. And our general policy is that the interconnection customer pays for the upgrades that are necessary to integrate their system. We don't see any reason to depart from that policy here. And, you know, they said the number one reason is, you know, they had not been harmed, these are costs they would have borne had there been no error. They're trying to get away from costs that it's their responsibility and they would bear had there been no error. And then they went through a few other reasons, and those reasons are all supported by the record. Your Honor has asked about the rareness of the case. It is the case, it is true for FERC that this is the first time that this type of mistake in the inputs has come before FERC and that they've been operating under this system for about 12 years. So I think they're allowed to say that. Have there been errors the other direction where the correction of the error would favor the generator? There have not been any other cases of an error in inputs. But the generator, according to the language that you quoted earlier, could go unilaterally to FERC and say, we want a downward adjustment. Of course. And that would happen automatically. I mean, if there was a mistake and they had over-calculated the amount of the error, the generator would immediately go to FERC and MISO probably would as well and say, this has to be reformed. And you were stating earlier the statement in FERC's brief about how there have been many other cases where there have been modifications, and there have been, and those are all cases where the configuration of the system changed because somebody in the queue dropped out, somebody in the queue jumped in. And so another reason why this is sort of an Alice in Wonderland case is that these figures bounce around, these networked operating figures bounce around depending upon what happens in the queue as they're waiting to get their turn to interconnect and whether something else happens. So it's... If somebody else drops out and an upgrade that everybody was assuming would be in place by the time the later project came along is not there, then your numbers go up, right? Right. Correct, Your Honor. Okay. There are many things that can happen that would cause those figures to bounce up. And as counsel for petitioners said, this is a several hundred million dollar project. There's actually, it's not in the round on the internet saying that it's 300 million dollars for the Settlers Project and 300 million dollars for the Pioneers Project. So they're spending 600 million dollars on the capital of these projects. So this 10 million is about 1.8 percent. So it's kind of hard for them to run and say, you know, we didn't expect this contingency and we're going to abandon this project. But the main thing is they didn't submit any affidavit of anybody saying this made a financial difference to us, we relied on this figure, we were going to abandon the project if we had known. That's not in the record and FERC noted that and said there's none of that before us. I think that will suffice. So thank you very much. And we'll give you a little extra time, Mr. Grabo, if you need it to respond. Mr. Grabo, in response to a question I asked following up a question from Judge Wood, I thought you clearly represented to me that there had been some detrimental reliance. Absolutely. That's actually what I was going to pick up on. The record does have a joint appendix of 560 and also 802. We told the Commission that we executed land lease options and we're holding options at that point and we're going to look at the network upgrades. Once the cost was given to us and we knew our cost to enter into this project, we went ahead and executed land lease options. During that period between February 5 and April 29? I can't say that for sure. That's very important to me at least. Well, said another way, did you execute these land leases before you were advised that the $6 million figure was bogus? I don't know that for sure. Well, that's what's operative. I understand. Most probably because the projects were due to come online the very next year. There was a very short window here. But there's no evidence of this. That's a problem, isn't it? No, there's evidence that the projects they were due to come online next year. No, no, that I know. But if there's no evidence of the date when you executed these land options, if you executed them after April 29, you'd been told that there was an extra $11.6 million of work that needed to be done, assuming you were going to keep the project at the 1-5th and then you lost out. From our position, I understand that, Your Honor. And we also put in the record that we executed equipment purchases based on the study results. But that occurred after the notification date. It wouldn't be reasonable detrimental reliance. I understand that. But detrimental reliance should not be a factor here. It should be the rule of law. And FERC had a body of precedent up to this point that said an interconnection customer can rely on the study results. Quoting going back from 2005 in cases. But if this had never come up, I mean I guess it's a little bit hard to say since there were other things that could happen that would mean that those numbers for reasons completely beyond your control could have changed. So if somebody higher up in the queue had pulled out, you would have had to cover what they otherwise would have done for your connection. But the point with that is the numbers are squishy. Well, yes and no. Because we are put on notice. They have to list. Let's say it another way. That if you are put on notice that the $6 million figure is no longer going to be a firm number, that there are going to be additional cost, and you elect to proceed with performance year end of the contract by going ahead and making these leases and the like after being notified of that, just applying basic contract principles. Haven't you waived whatever rights you have under the contract? No. To call the other side and breach. They've changed the material term. You've acquiesced in that change by continuing to perform. I would disagree, Your Honor. They hadn't changed the material term. In fact, it took them six, nine more months, nine months from when we executed the agreement for them to formally come to us and say, we've completed our studies. You are going to be assessed the extra $11 million. When were you advised that the $6 million figure was not a firm figure? It was not what? A firm figure. We were advised of that in November of 2011, not April. But you were told on April the 29th that it could be another $11.6 million. That's when Ameren... We knew there was an issue that they had. You knew there was more money on the table because you knew about the mistake. We knew about Ameren's mistake. It certainly was a material term. Let's just be straightforward here. I understand that the final tariff comes along later, but when one is looking at some sort of equitable allocation of things, what you knew, when you knew it, could all be important. I would say also the rule of law is very important here. And when we're talking about investing millions all over this nation for generations, we have to have certainty. That's why FERC put this process in place to begin with. And it said in precedent customers, you have the right to rely once the studies are done. No, we understand that. I think we've covered that point pretty thoroughly. You mentioned, Your Honor, about it could be $90 million. That's exactly right. We've seen network upgrades, $90 million, could be huge costs. And that's our concern with this type of precedent where there's no accountability now for the transmission provider. And a decision like this is extremely harmful. Not only are we harmed, and counsel said that it was $300 million per project. That's a lot of money. That's a lot of capital to invest. And this might look like a drop in the bucket, but it's not. You can also look on the internet and see that these projects are losing their shirt. We're not going to do too much internet shopping. Counsel brought it up, so I was adding to that. I'd also say that this is absolutely a contract. There are no regulations. FERC went outside the means of the tariff. Once the GIA was done, the only way our costs could change is if the restudy conditions occurred. It didn't happen. So what do you think Section 30.11 provides for? What's an appropriate use of that? Appropriate use is a new cost that comes down, not something that was the whole tariff process to begin with. A new cost like what? Congress passes a new cost on reliability, something that no one knew about that all generators, all systems have to account for. Where do you see that limitation in 30.11? It's a very narrow reading of it. That's correct. It is a broad provision, but from our point of view, to use a provision in the contract to go back and say the tariff has very, very limited means to reopen the study process and has a very specific study process, we think that's backwards. I think it's using a provision the way it should not be used. Alright, well, I think we have your position. We thank you very much. I thank you for your time. We would ask you to vacate FERC's orders. Thank you. Alright, we will take the case under advisement.